No. 24-11998-DD

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

David Thompson,

*Plaintiff-Appellee*,

v.

Regions Security Services, Inc.,

*Defendant-Appellant*.

On Appeal from
the United States District Court
for the Southern District of Florida
Case No. 0:20-cv-62152-WPD

**DEFENDANT-APPELLANT
REGIONS SECURITY SERVICES, INC.'S
INITIAL BRIEF**

Anthony F. Sanchez, P.A.
Attorneys for Defendant-
Appellant Regions Security
Services, Inc.
6701 Sunset Drive, Suite 101
Miami, Florida 33143
Tel.: 305-665-9211

By:  /s/ Anthony F. Sanchez
Anthony F. Sanchez
Florida Bar No.789925
afs@laborlawfla.com

24-11998-DD

*David Thompson v. Regions Security Services, Inc.*

**<u>CERTIFICATE OF INTERESTED PERSONS</u>**
**<u>AND CORPORATE DISCLOSURE STATEMENT</u>**

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1, I hereby certify that the

following persons may have an interest in the outcome of this case:

1.   Anthony F. Sanchez, P.A. – *Attorneys for Regions Security Services, Inc.*

2.   Dimitrouleas, Hon. William P. – *United States District Court Judge*

3.   Norell, Robert S. – *Counsel for David Thompson*

4.   Peterson, James A. – *Co-counsel for Plaintiff-Appellee David Thompson*

5.   Regions Security Services, Inc. – *Defendant-Appellant*

6.   Rivero Jr., Carlos – *President and CEO of Regions Security Services, Inc.*

7.   Robert S. Norell, P.A. – *Attorneys for David Thompson*

8.   Sanchez, Anthony F. – *Counsel for Regions Security Services, Inc.*

9.   Sharp, Christoper C. – *Co-Counsel for David Thompson*

10.  Sharp Law Firm, P.A. – *Attorneys for David Thompson*

11.  Thompson, David – *Plaintiff-Appellee*

I hereby certify that there is no publicly traded company or corporation that

has an interest in the outcome of this appeal.

Date checked:  August 28, 2024          By:  /s/ Anthony F. Sanchez
                                        ANTHONY F. SANCHEZ

                                        *Counsel for Defendant-*
                                        *Appellant Regions Security*
                                        *Services, Inc.*

C-1 of 1

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendant-Appellant Regions Security Services, Inc. ("Regions") respectfully requests oral argument. Regions submits that oral argument will elucidate the factual issues presented by this record on appeal and assist the Court in consideration of those issues. This case involves complicated facts and relationships incorrectly analyzed and characterized by the district court in the context of ruling on cross motions for summary judgment, which are subject to *de novo* review. Also, this is the second appeal arising from this case, and the district court below relied upon the opinion from the original appeal, which addressed only the sufficiency of the pleadings before any evidentiary record was created and even before discovery had commenced.

## TABLE OF CONTENTS

**Page**

Certificate of Interested Persons and Corporate Disclosure Statement.................................................................................C-1

Statement Regarding Oral Argument .........................................*i*

Table of Contents ................................................................. ii

Table of Citations............................................................... *v*

Statement of Subject-Matter and Appellate Jurisdiction ..........................................*ix*

Statement of the Issues.......................................................1

Statement of the Case..........................................................2

    (i)    Course of Proceedings and Disposition Below.....................................2

    (ii)   Statement of the Facts .......................................10

    (iii)  Statement Regarding Standard or Scope of Review ...........................23

Summary of the Argument....................................................25

Argument and Citations of Authority ...................................27

*Threshold Rule 68 Procedural Argument*

I.    AS A THRESHOLD MATTER, IT MUST BE STATED THAT THE FINAL JUDGMENT ENTERED BY THE DISTRICT COURT FAILS TO CARRY OUT THE MANDATORY, MINISTERIAL FUNCTION REQUIRED WHEN A RULE 68 OFFER OF JUDGMENT IS ACCEPTED. THE DISTRICT COURT FAILED TO "ENTER JUDGMENT ON SPECIFIED TERMS". THIS ERROR IS LIKELY HARMLESS ...................................27

*Substantive Argument Regarding*
*Summary Judgment*

II.   THE NEGOTIATED AND ACKNOWLEDGED "REGULAR RATE" PAID TO THOMPSON THROUGHOUT THE PERIOD OF ALLEGED FLSA OVERTIME VIOLATIONS IS NOT "WHOLLY UNREALISTIC AND ARTIFICIAL" ..........................................................31

    A.   The Negotiated and Acknowledged Reduced "Regular Rate" of $11.15 per Hour is a "Bona Fide Rate Reduction" in Consideration of the Three Relevant Factors Identified in *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794 (9th Cir. 2010)...................................................................32

    B.   Thompson Accepted a New Schedule that Would Include not *Less than a Minimum Sixty Hour Workweek* at the Straight-time Rate of $11.15 per Hour. The U.S. Supreme Court has (Since 1942) Deemed Such a Guaranteed Wage Agreement to be Compliant with the FLSA: *Walling v. A. H. Belo Corp.*, 316 U.S. 624, 631-32, 634 (1942) ...........................................35

    C.   The Negotiated and Acknowledged Reduced "Regular Rate" of $11.15 per Hour is Not "Wholly Unrealistic"..........................................................39

    D.   Neither is the Negotiated and Acknowledged "Regular Rate" of $11.15 per Hour "Artificial" Since It Represents the Only Compensation Actually Paid for Straight-time Hours Throughout the Alleged Period of FLSA Violations ...............................................41

Conclusion .........................................................................43

Certificate of Compliance with Type-Volume Limit ...............................44

Certificate of Service ..........................................................44

*iii*

Service List .............................................................................................45

## <u>TABLE OF CITATIONS</u>

**Cases**                                                                        **<u>Page(s)</u>**

*Aaro, Inc. v. Daewoo Int'l (Am.) Corp.*
    755 F.2d 1398 (11th Cir. 1985) .................................................*x–xi*

*Adickes v. S.H. Kress & Co.*
    398 U.S. 144 (1970)...................................................................24

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986)...................................................................23

*Bay Ridge Operating Co. v. Aaron*
    334 U.S. 446 (1948)..............................................................38, 42

*Bell Atlantic Corp. v. Twombly*
    550 U.S. 544 (2007)......................................................................4

*Dorse v. Armstrong World Indus.*
    798 F.2d 1372 (11th Cir. 1986) ............................................29–30

*Gonzalez v. Chinatown Hotel Corporation*
    808 Fed. Appx. 999 (11th Cir. 2020) ....................................27, 30

*Hawthorne v. Mac Adjustment, Inc.*
    140 F.3d 1367 (11th Cir. 1998) ....................................................4

*Horsley v. Rivera*
    292 F.3d 695 (11th Cir. 2002) .....................................................4

*Jordan v. Time, Inc.*
    111 F.3d 102 (11th Cir.1997) .....................................................28

*Owen v. I.C. Sys. Inc.*
    629 F.3d 1263, 1270 (11th Cir. 2011) ........................................23

*Patel v. Wargo*
    803 F.2d 632 (11th Cir. 1986) .....................................................8

*Parth v. Pomona Valley Hosp. Med. Ctr.*
  630 F.3d 794 (9th Cir. 2010 ....................................................32–35

*Quigg v. Thomas Cnty. Sch. Dist.*
  814 F.3d 1227 (11th Cir. 2016) ....................................................23

*Salinas v. Commercial Interiors, Inc.*
  848 F.3d 125 (4th Cir. 2017) ........................................................8

*ThunderWave, Inc. v. Carnival Corp.*
  954 F. Supp. 1562 (S.D. Fla. 1997) ..............................................4

*Thompson v. Regions Security Services, Inc.*
  67 F.4th 1301 (11th Cir. 2023) ........................................5, 32, 39

*Yunker v. Allianceone Receivables Mgmt., Inc.*
  701 F.3d 369 (11th Cir. 2012) ....................................................30

*Walling v. A. H. Belo Corp.*
  316 U.S. 624 (1942)........................................ 26, 32–33, 35, 37–38

*Walling v. Helmerich & Payne*
  323 U.S. 37 (1944).....................................................................5, 39

*Walling v. Youngerman-Reynolds Hardwood Co., Inc.*
  325 U.S. 419 (1945)..................................................5, 35, 39, 42

*Webb v. James*
  147 F.3d 617 (7th Cir.1998) ......................................................27

*Wethington v. City of Montgomery*
  935 F.2d 222 (11th Cir. 1991) ..............................................33, 38

## Statutes and Legislative Materials

28 U.S.C. § 1291 ....................................................................ix–x

28 U.S.C. § 1331 ........................................................................ix

29 U.S.C. § 207(a) ........................................................................... 2

29 U.S.C. § 207(e) ....................................................................... 41–42

29 U.S.C. § 216(b) ........................................................................... 3

§ 493.6100, Fla. Stat ...................................................................... *ix*

§ 493.6101(18), Fla. Stat ................................................................ *ix*

§ 493.6103, Fla. Stat ...................................................................... 10

§ 493.6301(1), Fla. Stat .................................................................. 10

**Regulations**

29 C.F.R.§ 778.108 ......................................................................... 42

29 C.F.R.§ 778.500 ..................................................................... 42–43

29 C.F.R. § 791.2 ............................................................................. 8

**Federal Rules and Procedure**

Rule 12(c), Fed. R. Civ. P ............................................................. 2–4

Rule 54(b), Fed. R. Civ. P ............................................................ *x–xi*

Rule 56(c), Fed. R. Civ. P .............................................................. 23

Rule 58, Fed. R. Civ. P ................................................................... 3

Rule 61, Fed. R. Civ. P ................................................................. 29

Rule 68(a), Fed. R. Civ. P ..................................................... 25, 27, 29

**Other Authorities**

10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2715, at 626–27 (2d ed. 1983)................................................................*x*

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

**Subject-Matter Jurisdiction**

Plaintiff-Appellee David Thompson ("Employee" or "Thompson") brought a lawsuit in one count alleging overtime violations under the Fair Labor Standards Act ("FLSA") by his now former employer, Regions Security Services, Inc. ("Regions" or "Employer"). The district court enjoyed federal-question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The violations supposedly occurred over a consecutive fifty (50) week period of employment. Thompson was an hourly wage security guard who brought the underlying lawsuit against Regions, a licensed "security agency" within the meaning of Florida Statute § 493.6101(18), and regulated by Florida law. Fla. Stat. § 493.6100.

**Appellate Jurisdiction**[1]

The jurisdiction of this Court to review the issues raised in this appeal derives from the federal statute pertaining to "final decisions of district courts". Specifically, 28 U.S.C. § 1291 provides, in pertinent part:

---

[1] /     On July 29, 2024, Regions responded to this Court's "Jurisdictional Question". *See* appellate docket entry number 15.

> The courts of appeals . . . shall have jurisdiction of appeals from <u>all</u> final decisions of the district courts of the United States, . . .

28 U.S.C. § 1291 (emphasis added).

The district court entered "Final Judgment" on May 20, 2024 [ECF No. 62]. The issues raised in this appeal arise from the district court's earlier interlocutory "Omnibus Order on Motions for Summary Judgment" [ECF No. 58], which granted the Employee's motion for summary judgment as to liability under the FLSA, and denied the Employer's motion for summary judgment. [ECF No. 58, p. 20[2]] (". . .[T]he Court will enter summary judgment in Thompson's favor as to liability, . . ."). It is well-settled that such an order "'is not appealable until the full case reaches judgment.'" *Aaro, Inc. v. Daewoo Int'l (Am.) Corp.*, 755 F.2d 1398, 1400 (11th Cir. 1985) (quoting 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2715, at 626–27 (2d ed. 1983)) ("[U]nless the court makes its order final under Rule 54(b), the grant of a summary judgment on less than the entire litigation normally is not appealable until the full case reaches judgment."). Because the "Omnibus Order" granting summary judgment as to liability was an interlocutory order not appealable as of right, the district court's ruling on liability could only be

---

[2] Pursuant to 11th Cir. R. 28-5, all references to the record in this brief refer to the page number appearing in the header generated by the district court's electronic filing system.

appealed once it "merged into the final judgment and is open to review on appeal from that judgment." *Id*.

Accordingly, since the factual issue of the number of overtime hours worked by Thompson, and the corresponding amount of wages and liquidated damages due under the FLSA remained pending, no final appealable judgment was entered until May 20, 2024 when the Court entered its "Final Judgment" [ECF No. 62].[3] The "Omnibus Order" became final and appealable when it merged into the Final Judgment [ECF No. 62]. *Aaro, Inc. v. Daewoo*, 755 F.2d at 1400.

---

[3] /    Rule 54(b) of the Federal Rules of Civil Procedure provides as follows:

(b) Judgment on Multiple Claims or Involving Multiple Parties. When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, *any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time* before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Rule 54(b), Fed. R. Civ. P. (emphasis added).

## **STATEMENT OF THE ISSUES**

1.     Whether the district court erred when, following an accepted Rule 68 Offer of Judgment on agreed specified terms, the district court entered a Final Judgment which failed to include the agreed "specified terms" pertaining to the reservation of the right to appeal the judgment as offered and accepted?

2.     Whether the district court erred by granting summary judgment for the Employee in an FLSA overtime case, and denying the Employer's motion for summary judgment, by concluding that the lawful rate of hourly pay actual paid to a security guard employee was "wholly unrealistic and artificial" for purposes of calculating his overtime premium rate, when the rate was undisputedly agreed to between the parties and acknowledged in writing by Employee *before* he worked any overtime hours, the agreed rate of pay remained in effect for the entire 50 week duration of his alleged FLSA violations, and the agreed rate was above the minimum hourly rate of pay required by the FLSA?

3.     Whether the district court erred by granting summary judgment for the Employee in an FLSA overtime case, and denying the Employer's motion for summary judgment, when the agreement between the parties establishing a lawful regular rate of pay for straight-time hours and was tied to a minimum number of weekly hours to be scheduled, such that it guaranteed a minimum weekly wage based upon at least twenty overtime hours scheduled and paid every week?

## STATEMENT OF THE CASE

**(i)** **Course of Proceedings and Dispositions Below**

Judgment on the Pleadings for Employer Regions

Plaintiff-Appellee David Thompson ("Thompson" or "Employee") brought a Complaint in one count against his employer, Defendant-Appellant Regions Security Services, Inc. ("Regions" or "Employer"), purporting to allege a violation of overtime wage requirements of the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 207(a). However, the allegations of the Complaint made clear that Regions meticulously complied with the FLSA's overtime requirements by paying the overtime premium rate for every overtime hour Thompson alleged that he worked during his entire tenure of employment, including the continuous fifty-week period of his employment during which he alleges the violations occurred.

Regions filed an Answer [ECF No. 6] to the Complaint, admitting the majority of allegations made, and shortly after filed a Motion for Judgment on the Pleadings [ECF No. 7] pursuant to Fed. R. Civ. P. 12(c) because the allegations of the Complaint were inconsistent with FLSA overtime liability. Indeed, Thompson's Complaint alleges he was paid for every overtime hour he worked at time-and-a-half of the regular rate for which he was employed during every workweek in which he worked overtime hours. The district court below agreed with Regions and granted

the Rule 12(c) Motion for Judgment on the Pleadings by Order entered on March

18, 2021 [ECF No. 14], specifically stating:

> There are no allegations establishing that [Regions] paid [Thompson]
> less than the overtime rate of "time-and-a-half" of his "regular rate" for
> hours he worked in excess of 40 during a given workweek at any time,
> in violation of §216(b) . . . [Thompson] was paid time-and-one-half
> overtime compensation throughout all periods of his employment . . .
> Accordingly, the Court finds that the factual allegations of the
> Complaint are inconsistent with FLSA overtime liability, and therefore,
> that [Regions] is entitled to entry of judgment on the pleadings in its
> favor.

ECF No. 14, pp. 4-5 (clarifications added).

Thereafter, in accordance with Fed. R. Civ. P. 58, the District Court entered

Final Judgment [ECF No. 15] in favor of Regions, and Thompson appealed.

### *"Thompson  Appeal I"*

The district court's original order granting Regions' Motion for Judgment on

the pleadings, and the corresponding original Judgment [ECF Nos. 14, 15] were

entered early in the proceedings, before any discovery had taken place and without

any record evidence, based only upon the allegations in the pleadings. The legal

premise of Thompson's pleading was (and remains) a bare-boned, conclusory

allegation that, notwithstanding the fact that he was paid the overtime premium rate

for all overtime hours worked, that he was entitled to have his overtime premium

rate calculated as a factor of his regular straight-time pay during workweeks when

he was paid a higher regular rate of pay than what he was undisputedly paid during

3

the specific workweeks when he alleges the overtime violations occurred. Thompson maintains that his rate of pay during the alleged period of violations was "artificial" because during other, previous workweeks he had been paid at a higher regular rate of pay, and that said *prior* regular rate of pay should have been utilized to calculate his overtime premium rate during subsequent periods when the alleged FLSA violations occurred. Thus, judgment on the pleadings was entered against Thompson based upon his own allegations, and in the complete absence of an evidentiary record.

Indeed, a motion for judgment on the pleadings challenges the legal sufficiency of the opposing party's pleadings. The Supreme Court has stated that a failure to plead "enough facts to state a claim to relief that is plausible on its face," warrants dismissal of the claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). However, to obtain a judgment on the pleadings, the moving party must also (as in a summary judgment scenario) clearly establish that no material issue of fact remains unresolved and that it is entitled to judgment as a matter of law. *ThunderWave, Inc. v. Carnival Corp.,* 954 F. Supp. 1562, 1564 (S.D. Fla. 1997). "Judgment on the pleadings under Rule 12(c) is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Horsley v. Rivera,* 292 F.3d 695, 700 (11th Cir. 2002) (citing *Hawthorne v. Mac Adjustment, Inc.,* 140 F.3d

1367, 1370 (11th Cir. 1998)). Accordingly, on appeal, a panel of this Honorable Court reversed the judgment on the pleadings in favor of Regions and remanded the case to district court in order to permit Thompson an opportunity to present evidence to support his claim that the lawful rate of pay he received for regular (non-overtime hours) hours worked during the period of the alleged violations was "wholly unrealistic and artificial". *Thompson v. Regions Security Services, Inc.*, 67 F.4th 1301, 1306-07 (11th Cir. 2023). Relying on Supreme Court precedent, this Court specifically stated:

> Indeed, the Supreme Court has said that "[t]he Act clearly contemplates the setting of the regular rate in a bona fide manner through wage negotiations between employer and employee, provided that the statutory minimum is respected." *Walling v. Helmerich & Payne*, 323 U.S. 37, 42 (1944). So "[a]s long as the minimum hourly rates established by Section 6 are respected, the employer and employee are free to establish [the] regular rate at any point and in any manner they see fit." *Youngerman-Reynolds*, 325 U.S. at 424. **The sole limitation on "this freedom of contract" is that it "does not include the right to compute the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purposes" of the FLSA**. *Helmerich & Payne*, 323 U.S. at 42.
>                                    * * *
> [W]e can't tell based on the pleadings alone whether the parties permissibly contracted for the $11.15 rate.

*Thompson v. Regions Security Services, Inc.*, 67 F.4th 1301, 1306-07 (11th Cir. 2023) (bold emphasis added). Thus, insofar as FLSA liability is concerned, the only factual issue on remand was whether the lawful regular rate of pay Thompson undisputedly

received during the period of his alleged overtime violations was calculated in a "wholly unrealistic and artificial" manner.

Litigation Upon Remand to District Court

On remand, discovery was completed and the record below made clear that Thompson was correctly paid *at least* the overtime premium rate of pay for each of the agreed *minimum* of twenty overtime hours he was scheduled to work beginning in 2019 and extending through the entire period of the alleged overtime violations. The record makes clear that Regions is an outsourcing security agency, licensed and regulated by Florida law to provide security services for its commercial customer base. As such, while Regions is an employer of security officers (such as Thompson), the employees of Regions actually render their labor at the locations of other businesses and government agencies who order security services by contract. The customers negotiate and contract to order a fixed minimum number of security service personnel hours per week, at a negotiated contract rate. The number of weekly hours ordered by the client cannot be reduced by the customer earlier than the applicable term of the contract.[4] Accordingly, on an approximately yearly basis, at the end of the contractual period, the customer can choose to reduce the number

_____

[4] /    During the term of the contract, the customer may order more hours than contemplated by the contract, but it may not reduce the number of weekly hours negotiated in the contract.

of weekly security service hours it will order, and is essentially free to re-enter the marketplace for security services. Here, the record[5] undisputedly demonstrates that as the calendar year of 2019 approached, the client at whose office building Thompson worked for several years (even prior to Regions taking over the contract) would require fewer weekly security service hours. Thus, a new contract had to be negotiated in light of the change in demand for services by the customer. In this situation, Regions must recalibrate the scheduling and staffing decisions it made to meet the prior contract, and must renegotiate with available staff how best to meet the changing demand for security services by its client. Regions was not required to assign Thompson to the same location at which he had been working for several years, but Thompson wanted to stay at that location, and he did not want to have his hours reduced. He wanted to work more hours than he was working, not less. Moreover, Thompson also had a second security services job with another employer at a different venue at a lesser hourly rate than he had been earning with Regions. In fact, between two unrelated employers, Thompson had been working about 64 hours per week, but not earning regular overtime premium wages because he rarely worked

---

[5] /    The facts and record developed in district court are more expansively detailed (including citations to the record) in the "Statement of Facts" portion of this brief, infra at pp. 10.

more than 40 hours for either employer.[6] Thus, beginning 2019, Thompson was faced with the prospect of continuing to work at the same location/client, but with fewer scheduled hours, or being reassigned to a different venue altogether, meaning he could work fewer hours, and continue to work about 60 hours per week (or less) without earning any overtime wages. It is undisputed that Thompson could have kept a reduced weekly schedule (by about 2-6 fewer weekly hours reflecting the reduced client-order), and to have kept his regular hourly rate, but he wanted to work more hours, not less. Accordingly, Thompson negotiated a schedule by which he was assured to be scheduled and paid for at least an additional twenty (20) hours of overtime work per week (notwithstanding the reduction of hours ordered), but at a reduced regular hourly rate ($11.15 from $13.00) which was still greater than what he had been working for the second employer ($11.00). This arrangement guaranteed Thompson an increase in weekly take-home pay, without meaningful increase in the aggregate number of weekly hours he was already working. Prior to working his first hour in calendar 2019, Thompson acknowledged in writing his new

---

[6] /    An employer is not responsible for hours worked by employees with other employers, unless of course there is a joint-employer relationship. *See* 29 C.F.R. § 791.2. *Patel v. Wargo*, 803 F.2d 632, 635–36 (11th Cir. 1986). "Separate employers may disregard all work performed by the employee for the other employer when determining their obligations under the FLSA." *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 133–34 (4th Cir. 2017)(internal quotations omitted).

regular hourly rate, and it is a fact that he was assigned *at least 20 additional overtime hours* per week, as promised for all of calendar 2019 and extending throughout the entire period of alleged FLSA violations.

The record developed since *Thompson Appeal I* makes clear that Thompson acknowledged and accepted an offer to work at a well-above minimum wage regular rate of straight-time pay ($11.15) commencing with the first workweek of calendar 2019 with the clearly linked understanding that he would be scheduled to work and paid for *not fewer that sixty (60) hours per week* (*i.e.*, at least twenty (20) overtime hours). During that time he received no other compensation beside his regular straight time rate of pay, and was actually paid for the scheduled hours promised; he knew in advance of every workweek what his regular rate of pay would be for the duration of the new contract term; he acknowledged, and accepted to work at the regular straight time rate of pay for the straight time hours he allegedly worked during the Period of the Alleged FLSA Violations before he worked *any* hours; and, that he was not even *required* to accept an overtime work schedule, but rather elected to do so in order to improve his working situation, which the new schedule and rate clearly and objectively did. Thus, it was only by negotiating a **minimum 20 additional hours** of scheduled work with Regions and consolidating his schedule under one proverbial roof that Thompson was able to start earning overtime pay for the sixty-four hours he was already working.

Notwithstanding the above, the district court denied Regions' motion for summary judgment, and granted Thompson's motion for summary judgment (as to liability only) based upon the idea that Thompson could not negotiate to work an additional twenty (20) hours per week with Regions, unless Regions paid the overtime hours based upon the regular rate (of $13.00 per hour) applicable under the *prior* contract with the client. [*See* Omnibus Order, ECF No. 58, pp. 18:18-20 to page 19:1]. Thus, the district court determined that Thompson could not negotiate to consolidate his workweek under one employer so that he could make more money, and be paid overtime premium rates for hours he was already working, because to do so would violate *dicta* from this Court's *Thompson Appeal I*. *Id*.

**(ii)**    <u>**Statement of the Facts**</u>

<u>The Security Services Industry</u>. The employer, Regions, is a Florida corporation providing licensed security officers to meet the security needs of its clients in Miami-Dade, Broward, and Palm Beach counties. [Declaration of Carlos Rivero, Jr., ECF No. 31, p. 1, ¶ 2.]. The security services industry is regulated by state law and the Florida Department of Agriculture and Consumer Services ("FDOACS"), which issues required licenses. § 493.6103, Fla. Stat. Any person or entity which "engages in business as a security agency shall have a Class "B" license." § 493.6301(1), Fla. Stat. At all times material to this case, Regions has, *inter alia*, the required Class "B" license necessary to operate as a security agency

and provide licensed security officers to work at the locations of clients. [Rivero Decl., ECF No. 31, p. 1, ¶ 3; Regions License, ECF No. 31-1]. Regions' clients are independent businesses of many different types, sizes, budgets, and needs which require security services for the protection of persons and property in connection with their unique operations. [Rivero Decl., ECF No. 31, p. 2, ¶6]. The vast majority of people employed by Regions are licensed security guards hired to work at the locations of its clients, each of which independently negotiate and contract for the specific services they require depending on their specific needs. [Rivero Decl., ECF No. 31, p. 2, ¶ 7].

Regions enters into periodic "Service Agreements" to provide a fixed number of "security service personnel-hours" per week at a negotiated hourly contract rate. [Rivero Decl., ECF No. 31, p. 3, ¶ 8]. In accordance with the terms of the "Service Agreement", the client may not reduce the number of hours it requires until the term of the contract is complete. When this happens, decisions are made regarding how to best meet changing schedule and staffing needs. [Rivero Decl., ECF No. 31, p. 3, ¶ 9]. Correspondingly, the negotiation of schedules and wages between Regions and its individual security guard/employees depends upon the underlying "Service Agreement" with specific clients. *Id*. Based upon contracted variables including the number of posts (locations) at which a guard is needed, and the budget of the client, Regions is obliged to provide licensed security officers, qualified and willing to

provide the services ordered in a manner which is consistent with Regions' business judgment, and available resources. The nature of the business is *matching* the needs and budget of a client with a correspondingly suitable officer *willing* to work a specific schedule and location. [Rivero Decl., ECF No. 31, p. 3, ¶ 10].

Regions *offers* available assignments to qualified guards which Regions deems to be suitable for specific assignments. Sometimes this means Regions will offer an available assignment to a guard previously working at a different assignment, and other times it will offer the assignment to a qualified guard who is either between assignments or is a new hire. Still other times, the assignment for a new contractual period is offered to the same guard or guards previously assigned during the prior contract. [Rivero Decl., ECF No. 31, pp. 3-4, ¶ 11]. Regions determines which security guard or guards to whom it will offer available assignments, and determines how to specifically staff the order from among its guards willing and available to work the assignment based upon the compatibility and suitability among available guards. [Rivero Decl., ECF No. 31, p. 4, ¶ 12].

At the commencement of every new contract or periodic amendment to the weekly hours ordered by the client, Regions must determine how to re-staff the order and determines potential assignment proposals which might be *offered* to suitable guards to meet the changing needs of the client. It is undisputed that Regions does not require that guards accept an assignment, a schedule, or pay rate. If acceptable

conditions are not reached, Regions attempts to find an acceptable offer and assignment for any officer who rejects an offer. [Rivero Decl., ECF No. 31, p. 4, ¶ 13]. The net revenues and profitability of Regions as a going concern come almost entirely from the placement of security guards for work with compatible assignments. Regions' viability depends upon keeping security guards employed. In other businesses, payroll expenses might strictly represent a cost of doing business, but in a "security agency", employment of officers *is* the business and the primary source of revenues. [Rivero Decl., ECF No. 31, p. 4, ¶ 14].

**Work Information Sheet.** As a matter of practice and procedure, Regions memorializes pay rate changes to ensure that the guard accepts and acknowledges a pay rate change and knows what his pay rate is *before* he accepts a new schedule and commences work. [Rivero Decl., ECF No. 31, pp. 4-5, ¶ 15]. This document is called the "Work Information Sheet". *Id*. The Work Information Sheet also specifically identifies the seven-day workweek which will be utilized for calculating any overtime wages earned. [Rivero Decl., ECF No. 31, p. 5, ¶ 16; Work Info., ECF No. 29-2]. The "Work Information Sheet" executed by Thompson in the first days of 2019 is a part of the record in this case. [Rivero Decl., ECF No. 31, p. 5, ¶ 17; Work Info., ECF No. 31-2]. Thompson does not deny that he signed the document, and he admits he knew that he agreed to work at the regular rate of $11.15 per hour

*before* he performed work during calendar 2019 and throughout the period of his alleged FLSA violations. [Thompson Depo., ECF No. 28-1, pp. 70:2–71:15].

**Pay Records**. During the period of his alleged FLSA violations, Thompson was actually paid for every hour of work scheduled at the regular rate of pay to which he had agreed on his most recent "Work Information Sheet".  A true and correct copy of Thompson's pay records during the period of the alleged FLSA violations are a part of the record. [Rivero Decl., ECF No. 31, p. 5, ¶ 18; Pay Records, ECF No. 31-3]. It is undisputed that during the period of his alleged FLSA overtime wage violations, Thompson was actually paid *only* the acknowledged and accepted hourly rate of pay, and that he received no other compensation on account of the first forty hours of his scheduled workweek. [Thompson Dep., ECF No. 28-1, p. 104:2–13]; [Rivero Decl. ECF No. 31, p. 5; ¶ 19; Pay Rec., ECF No. 31-3]. During the period of his alleged FLSA wage violations, any and all work scheduled for Thompson in excess of forty hours during any and all workweeks was actually paid at the premium rate of 1.5 times the regular rate he acknowledged and accepted as reflected on his "Work Information Sheet". [Thomspon Dep., ECF No. 28-1, p. 104:2–13; Rivero Decl. ECF No. 31, p. 5, ¶ 19; Pay Rec., ECF No. 31-3].

Thompson admitted that neither Regions nor anyone employed by Regions required that he accept any schedule or pay rate change in 2019, and that he never communicated any unwillingness to work the schedule and pay rate offered to him.

[Thompson Dep., ECF No. 28-1, pp. 98:24–99:9]. Thompson deliberated over the decision before accepting it because he needed the extra money he would earn by working a *minimum* of 20 paid overtime hours per week for Regions.

**The House Rules of Regions Security**. Every security guard employed by Regions is required to be familiar with, and to acknowledge, certain "House Rules" which represent material and accepted terms and conditions of employment. [Rivero Decl., ECF No. 31, p. 6, ¶ 23]. A true and correct copy of the "Regions House Rules", as acknowledged by Plaintiff David Thompson, is part of the record. [Rivero Decl., ECF No. 31, p. 6, ¶ 24; House Rules, ECF No. 31-4]. Because, by nature, security services are typically provided by licensed security guards – not at the location of their employer, but rather – at the location of a client, honesty and accuracy of time-keeping are especially important. [Rivero Decl., ECF No. 31, p. 6, ¶ 25]. Regions House Rule # 2 provides as follows:

> I understand that my schedule will be posted as soon as the business for the following week can be forecasted and that my attendance is mandatory on those days scheduled. I also understand that if through an emergency, I cannot arrive to work on the schedule day and time, I will call my department and speak with a manager or department supervisors to explain my absence at least (12) hours before the time I am scheduled to report to work.

[Rivero Decl., ECF No. 31, p. 6, ¶ 26; House Rules, ECF No. 31-4, p. 1, ¶ 2].

An assigned security guard is required to work the assigned *schedule* he or she has accepted. While the schedule necessarily translates to a specific number of

hours, it is the schedule that is ordered by the client that the security guard is required to work. Billing is premised upon the idea that a security guard was at their assigned post for the entire duration of their schedule. The security guard is paid a negotiated hourly wage for the number of hours they are *scheduled*. Thus, memorializing a timely arrival at the beginning of a shift, and the timely departure at the end of the shift, is of fundamental importance to ensure that the security guard employee was present for the complete schedule for which services are ordered. [Rivero Decl., ECF No. 31, p. 7, ¶ 27].

**Employee: David Thompson**. Thompson was employed by Regions from approximately February 11, 2015 through October 19, 2020. [Rivero Decl., ECF No. 31, p. 8, ¶ 32]. Throughout all times material to this case, Thompson was assigned the "front desk" post at an office building for the client "BB University, LLC". [Rivero Decl., ECF No. 31, p. 8, ¶ 33; Work Info., ECF No. 31-2].

**Assigned Schedule Record**. Regions keeps an automated record of every schedule assigned to each security guard it employs. [Rivero Decl., ECF No. 31, p. 8, ¶ 34]. A true and correct copy of Thompson's automated "Employee Schedule", for the entire duration of his employment, is a part of the record in this case. [Schedule, ECF No. 31-5, pp. 1-19].

For the first few years (ending December 31, 2018) of Thompson's employment with Regions, he was typically scheduled to work a 40-hour weekly

schedule. Specifically, Thompson was typically scheduled to work on Tuesdays from 7:00 a.m. – 3:00 p.m. and then from 7:00 a.m. – 11:00 p.m. on Thursdays and Friday, for a total of 40 scheduled hours. Occasionally, during that period, Thompson might cover another guard's shift such that he would be scheduled a few additional hours, for which he would be paid at the overtime premium rate for all hours scheduled in excess of 40 during any given work week. [Rivero Decl., ECF No. 31, p. 8, ¶ 35]. Commencing with the calendar year 2019, and continuing throughout the period of the alleged FLSA violations, Thompson accepted an assignment to continue working at the same BB University location, but working a five day per week schedule, including Mondays and Fridays, for a schedule of *not less than 60 hours per week*. [Rivero Decl., ECF No. 31, p. 9, ¶ 36]. It is clear from his posted Schedule History (ECF No. 31-5, pp. 1-19), his Timekeeping Records (ECF No. 31-6, pp. 1-23), and his pay records (ECF No. 31-3, pp. 1-25), that during this period of time he was never scheduled to work fewer than 60 hours per week, and that he was never paid for less than 60 hours per week as negotiated.

**Timekeeping Record**. Regions keeps an automated record of the clock-in and clock-out timekeeping data generated by the security guards it employs. [Rivero Decl., ECF No. 31, p. 9, ¶ 37]. A true and correct copy of Thompson's clock-in and clock-out timekeeping data, for the period beginning January 2019 through September 2020, is a part of the record in this case. [Time Rec., ECF No. 31-6,

pp. 14-23]. A comparison of Thompson's assigned schedule [ECF No. 31-5, pp. 1-19] and his self-generated timekeeping records [ECF No. 31-6, pp. 1-23] reflects that he had serious problems keeping to the assigned schedule. In fact, the records make clear that Thompson rarely arrived on-time and frequently arrived later than 20 minutes *after* his scheduled shift commenced. [Rivero Decl., ECF No. 31, p. 9, ¶ 38]. This was a persistent problem throughout the entirety of his employment with Regions. *Id.*

**Discipline**. Throughout his employment, Thompson was issued at least four (4) written warnings and an additional final warning as written discipline. [Rivero Decl., Rivero Decl., ECF No. 31, p. 9, ¶ 39]. All of the referenced disciplinary actions result from tardiness, absenteeism, or other violation of the Regions House Rules. *Id.* True and correct copies of the various written warnings and the final warning issued to Thompson are part of the record in this case. [Disc. Rec., ECF Nos. 31-7 through ECF No. 31-11]. During Thompson's deposition, he testified that prior to arriving to the front desk post at the BB University building, he would routinely stop in to visit the office of Mr. Lesley Diaz, whom Thompson describes as the "building chief engineer". [Thompson Dep., ECF No. 28-1, p. 112:1–25]. This is not a part of Thompon's "front desk" assignment at BB University. [Rivero Decl., ECF No. 31, ¶40].

**Moonlighting**.[7] For his entire period of employment with Regions, Thompson also worked for a different security company known as "United Security Services". [Rivero Decl., ECF No. 31, p. 10, ¶ 41]. According to Thompson's own interrogatory answers, in addition to full-time employment with Regions, he worked an additional 24 hours per week for a company he referred to as "United Security Services" at an entirely different post, for which he claims to have been paid at the rate of no more than $11.00/hour. [ECF No. 31, p. 10, ¶ 41; Interr. Ans., ECF No. 31-12, at p. 5, Interrogatory No. 8]. Regions has no direct or indirect interest, ownership, control over, or any relationship with "United Security Services". [Rivero Decl., ECF No. 31, p. 10, ¶ 42]. The only knowledge Regions has regarding "United Security Services" is what it can glean from public records. *Id*.

Thus, during the period of employment with Regions ending with calendar year 2018, Thompson typically was scheduled to work at least 40 hours per work week for Regions, and an additional 24 hours per work week for a completely separate and unrelated security agency. [Rivero Decl., ECF No. 31, p. 11, ¶ 46]. According to Thompson, he typically worked at least 64 hours per week, but would not typically receive overtime pay from either employer because his combined workweek was split between two different employers. [Thompson Depo., ECF No.

---

[7] The term "Moonlighting" refers to when an employee works more than one job for different employers. *See* https://www.law.cornell.edu/wex/moonlighting.

28-1, pp. 82:5–83:9]. During this period, the only overtime Thompson would receive would come from Regions during workweeks in which he worked more than 40 hours for Regions. [Rivero Decl., ECF No. 31, p. 11, ¶ 45].

**The Service Agreement with the Client: BB University, LLC**. The operating terms of service which existed between Regions and BB University, LLC throughout 2019 and throughout the entire period of the alleged FLSA violations, are reflected in the "Service Agreement" which is a part of this record. [Rivero Decl., ECF No. 31, p. 11, ¶ 46; ECF No. 31-15]. Commencing with calendar year 2019, BB University, LLC (the client) changed the number of weekly security service hours it would order from Regions from 88 weekly hours to 82 (one fewer hour per day). [Rivero Decl., ECF No. 31, p. 11, ¶ 46]. The negotiated client contract rate for this period of time was $17.72 per weekly hour of service. [Rivero Decl., ECF No. 31, p. 11, ¶ 46; BBU Contract, ECF No. 31-15, p. 12].

Prior to the reduction in BB University's order commencing at the beginning of 2019, Regions had typically assigned Plaintiff Thompson a forty-hour fulltime schedule at BB University. [Rivero Decl., ECF No. 31, p. 11, ¶ 47]. He worked Tuesdays from 7:00 a.m. to 3:00 p.m. and double shifts on Thursdays and Fridays from 7:00 a.m. to 11:00 p.m. for a total of forty (40) hours per week, excluding any additional hours he might pick up by covering for any among the several other part-time guards regularly assigned to covering the remaining 48 hours under the

20

previous contract with BB University. [Thompson Dep., ECF No. 28-1, p. 45:14–19]; [Schedule, ECF No. 31-5, pp. 9-10].

The logical adjustment for Regions would have been to offer slightly reduced hours to each of the guards, including Thompson, who was already working more hours than the other guards regularly assigned to the account. [Rivero Decl., ECF No. 31, p. 12, p. 12, ¶ 48]. It is unrebutted fact that Thompson could have kept something resembling the same schedule from the prior year, or a slightly reduced schedule, and Regions would have easily filled the remaining forty-two (42) hours or so of the BB University contract among the several part-time security guards previously assigned to the account. [Rivero Decl., ECF No. 31, p. 12, ¶ 49]. However, because Thompson was already working an additional 24-hour weekly schedule for a separate security agency, at an hourly rate of $11.00 per hour, it made objective sense to offer him, and for Thompson to accept, an offer whereby he would be paid a regular time hourly rate of $11.15 per hour, while scheduling him an additional 20 scheduled hours or more of account coverage, all or most of which would represent overtime work hours, payable at the overtime premium rate of $16.73 per hour. [Rivero Decl., ECF No. 31, p. 12, ¶ 50]. Thompson was not required to accept the additional hours or any reduction in regular rate of pay, but he unambiguously chose to accept the changes offered because it resulted in a bigger paycheck from Regions and it resulted in his being paid at an overtime premium rate

21

for at least 20 hours per week. This represents an objectively clear improvement from his situation the prior year, when Thompson was working 64 hours per week and not receiving any overtime premium pay. [Rivero Decl. ECF No. 31, p. 12, ¶ 51]. Thompson's deposition testimony and his Interrogatory responses, make clear that in addition to the additional 20 hours of work scheduled by Regions during 2019, he continued to work an additional eight (8) hours on Saturdays, at the rate of $11.00/hour with the separate and unrelated United Security Services agency. [Thompson Dep., ECF No. 28-1, p. 96:4–19 and p. 136:2–7; Thompson Interrog., ECF No. 31-12, p. 5, item 8].

Consistent with Regions' policy of memorializing and documenting pay changes, it issued to Thompson a "Work Information" form memorializing that, for workweeks beginning 2019, he would be assigned to work the front desk post at BB University office building and that he would be paid at the regular rate of $11.15/hour for the first 40 hours of work. The information was discussed with Thomspon and acknowledged by him in a telephone conversation with Human Resources Manager Natalia Restrepo, who spoke with Thompson and annotated the telephone conversation on the form, and then shortly thereafter personally delivered the form to Thompson at his post where he signed the document acknowledging his new regular rate of pay going forward. [Rivero Decl. ECF No. 31, pp. 12–13, ¶ 52; Work Info., ECF No. 31-2].

It is undisputed that Thompson knew, acknowledged, and accepted what his regular hourly rate of pay would be prior to the commencement of each and every work week that he was employed by Regions and that he was timely paid at the overtime premium rate for every overtime hour he worked. [Rivero Decl. ECF No. 31, p. 13, ¶ 53]. It is undisputed, and in fact specifically alleged by Thompson, that he was paid the overtime premium rate for every overtime hour he was scheduled to work while employed by Regions. [Complaint, ECF No. 1, ¶¶ 8, 11]. The overtime premium rate paid to Thompson throughout his employment with Regions was always a factor of the regular rate of pay that he was actually paid during any work week that he was scheduled to work overtime hours. [Rivero Decl. ECF No. 31, p. 13, ¶ 53; Pay Records, ECF No. 31-3].

**(iii)**    <u>**Statement Regarding Standard or Scope of Review**</u>

This Court reviews *de novo* a district court's ruling on motions for summary judgment, drawing "all reasonable inferences in the light most favorable to the non-moving party." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016)(quoting *Owen v. I.C. Sys. Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011)). Summary judgment may be granted only if "there is no genuine issue as to any material fact and...the moving party is entitled to judgment as a matter of law." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d at 1235 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986)(*quoting* Fed.R.Civ.P. 56(c))). A genuine issue

of fact exists when "the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d at 1235 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248). Summary judgment is only appropriate if a case is "so one-sided that one party must prevail as a matter of law." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d at 1235 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251-52). The party moving for summary judgment bears the burden of establishing the absence of material facts. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## SUMMARY OF THE ARGUMENTS
### *Threshold Rule 68 Procedural Argument*

I.       As a threshold matter, the Final Judgment entered by the district court clearly fails to carry out the mandatory, ministerial function required when a Rule 68 Offer of Judgment is offered by a defendant, and accepted by a plaintiff. Under Rule 68 "a party defending against a claim may serve on an opposing party an offer to allow judgment *on specified terms . . .*". Rule 68(a), Fed. R. Civ. P. (emphasis added).  When an Offer of Judgment is accepted, a district court is required to enter judgment *on such specified terms*. The *entry* of a Rule 68 judgment is in fact a "ministerial rather than discretionary" function. The district court failed to carry out that function. Rather than enter the agreed judgment offered, which expressly reserved the right to appeal the judgment, the district court entered a very different form that had not been agreed to by any party, and which purported to cast doubt upon whether any right of appeal was rendered moot by the "agreed" judgment. The district court also erred by treating the agreement for entry of judgment like a fully consummated settlement agreement, which it was not. The district court's error in this regard is likely harmless, since this appeal is clearly not moot and the judgment remains unsatisfied and stayed from execution. However, to the extent that this Court determines that the right of appeal would turn upon the agreement between the parties being evident in the final agreed judgment entered by the district court, Regions appeals the clear failure of the district court to ministerially enter judgment.

### *Substantive Argument Regarding Summary Judgment*

II.    The district court erred by granting the Employee's motion for summary judgment as to FLSA overtime liability, and by denying the Employer's motion for summary judgment because the record makes clear that the regular hourly rate upon which the overtime premium was calculated is the actual hourly rate paid to Employee for straight-time work throughout the period of alleged FLSA violations. There was no other remuneration paid to Employee for straight-time hours. Moreover, *before* Employee worked *any* overtime hours, he had acknowledged in writing what his regular rate would be, the agreed rate remained in effect for almost a whole year, and the agreed rate was well above the minimum hourly rate required by the FLSA. Further, the agreed rate was also linked to an undisputed understanding the Employee would be scheduled to work at least a *minimum of twenty overtime hours every week*, for which he would be paid at the corresponding overtime premium rate. For the entire period of alleged FLSA violations, Employee was scheduled to work at least sixty hours per week and paid all overtime hours at the corresponding premium rate. By tying the regular rate to a *minimum* number of hours scheduled, the agreement between the parties also amounts to a guaranteed weekly wage agreement expressly permitted by controlling U.S. Supreme Court authority. *Walling v. A. H. Belo Corp.*, 316 U.S. 624 (1942). To hold otherwise would impermissibly invade the parties' right to contract.

## ARGUMENT AND CITATIONS OF AUTHORITY

### *Threshold Rule 68 Procedural Argument*

**I.    AS A THRESHOLD MATTER, IT MUST BE STATED THAT THE FINAL JUDGMENT ENTERED BY THE DISTRICT COURT FAILS TO CARRY OUT THE MANDATORY, MINISTERIAL FUNCTION REQUIRED WHEN A RULE 68 OFFER OF JUDGMENT IS ACCEPTED. THE DISTRICT COURT FAILED TO "ENTER JUDGMENT ON SPECIFIED TERMS". THIS ERROR IS LIKELY HARMLESS.**

As a threshold matter, it is notable that the district court clearly erred by entering a "Final Judgment" [ECF No. 62] which does not resemble the form of "Final Judgment" [ECF No. 61-1, p. 4] which Regions offered to Thompson under Rule 68, and which Thompson accepted. Rule 68 is clear and requires the district court to perform a ministerial function, which the district court did not fulfill. The Rule provides that "a party defending against a claim may serve on an opposing party an offer to allow judgment *on specified terms . . .*". Rule 68(a), Fed. R. Civ. P. (emphasis added). When an Offer of Judgment is accepted, the Court is required to enter judgment **on such specified terms**. *Id*.; *Gonzalez v. Chinatown Hotel Corporation*, 808 Fed. Appx. 999 (11th Cir. 2020) ("Typically, when a Rule 68 offer is accepted, the district court is left with *nothing to do but enter the agreed-to judgment*.") (emphasis added). In fact, *entry* of a Rule 68 judgment is a "ministerial rather than discretionary" function, *Webb v. James,* 147 F.3d 617, 621 (7th Cir. 1998), which leaves a district court no room to review – let alone alter – the specified

terms of a Rule 68 offer. *See Jordan v. Time, Inc.,* 111 F.3d 102, 105 (11th Cir.1997) ("[T]he mandatory language of the rule leaves no room for district court discretion.").

In this case, following the district court's entry of the omnibus order on cross motions for summary judgment [ECF No. 58], which granted Thompson's motion for summary judgment as to FLSA liability, and denied Regions' motion for summary judgment, Regions offered, and Thompson accepted the proposed entry of a judgment which expressly contemplated and reserved for the Employer the right to appeal the district court's erroneous determination of FLSA liability. [ECF No. 61-1, p. 4, ¶4] ("This Final Judgment is entered without prejudice to Defendant Regions Security Services, Inc.'s right to appeal.") There is also a stipulation in the record to the same affect. [ECF No. 59] ("This stipulation does not prejudice the right of either party to appeal from a final judgment. . .The intent of this stipulation is to preserve that right."). However, the district court entered a completely different "Final Judgment" of its own drafting, which excludes the language reserving the right to appeal, purports to cast doubt on the ability of any party to appeal the judgment, and purports to approve a "settlement" that was never reached, and to suggest that a material term of the offer of judgment is excludable because the appeal of a money judgment that has not and cannot be satisfied, might nevertheless be "moot". [ECF No. 62]. As such, the district court erred by failing to enter judgment

on "specified terms" agreed to by the parties and required by Rule 68, and rather entered a separate "agreed" judgment to which no one agreed.[8]

Perhaps as a result of the district court's entering a "Final Judgment" erroneously suggesting that an appeal might be barred as moot, this Honorable Court asked the parties to brief the jurisdictional question shortly upon Regions timely filing of the Notice of Appeal. [Appellate Docket Entry, ECF No. 12-2] ("Please address whether this appeal is moot given the defendant's accepted offer of judgment under Fed. R. Civ. P. 68(a) and the subsequent final judgment.") Regions has fully briefed the jurisdictional issue making clear that under controlling authority, a party may enter into an agreement for the entry of a final judgment against it while retaining the right to appeal such judgment. [Appellate Docket Entry, ECF 15]; *see also Dorse v. Armstrong World Indus.*, 798 F.2d 1372, 1374-77 (11th Cir. 1986). The agreement that judgment be entered reserving the right to appeal is plainly evident in the record. Further, the judgment has certainly not been satisfied, and

---

[8] /    This clear error by the district court in entering a "Final Judgment" that does not reflect (or that might even reject) the Rule 68 agreement that judgment be entered "on the terms specified", might well be considered "harmless error" within the meaning of Rule 61, Fed R. Civ. P., because there is no authority requiring that in order to reserve the right of appeal from a Rule 68 judgment (or any judgment entered by agreement) the judgment itself must reflect or endorse the agreement to reserve a right of appeal. However, to the extent that this Court could rule or maintain that a reservation of jurisdiction must be present or evident in the form of agreed judgment actually entered, Regions must also appeal the district court's failure under Rule 68 to enter judgment on the terms specified reserving appellate jurisdiction.

execution thereon has been stayed by order without objection, so satisfaction is not even currently permissible; as such this appeal is certainly not moot. *Yunker v. Allianceone Receivables Mgmt., Inc.*, 701 F.3d 369, 372-74 (11th Cir. 2012).

Because the record reflects the agreement between the parties, and there is no authority suggesting that the agreement between the parties must be evident or endorsed in the form of judgment actually entered, Regions maintains that the district court's error is likely harmless. However, to the extent this Court rules that the agreement must be reflected in the judgment actually entered, Regions appeals the district court's failure to enter judgment "on specified terms". Moreover, neither can the district court have correctly entered a judgment by agreement of the parties, while rejecting the "specified terms" agreed to by the parties. Thus, to the extent that the jurisdictional question presented would turn upon any material distinction between the form of "Final Judgment" entered by the district court, and the agreement actually offered and accepted, then the Final Judgment is erroneously entered because Regions Security did not offer or agree to the entry of a judgment which fails to recognize its right to appeal the judgment. *See Dorse v. Armstrong*, 708 F. 2d at 1376; *Gonzalez v. Chinatown Hotel Corporation*, 808 Fed. Appx. at 1003. If the district court rejected the agreement, it could not have properly entered any other judgment, "agreed" or otherwise.

*Substantive Argument Regarding Summary Judgment*

**II.  THE NEGOTIATED AND ACKNOWLEDGED "REGULAR RATE" PAID TO THOMPSON THROUGHOUT THE PERIOD OF ALLEGED FLSA OVERTIME VIOLATIONS IS NOT "WHOLLY UNREALISTIC AND ARTIFICIAL".**

Since the *Thompson Appeal I* was decided, evidence developed on remand makes clear that Thompson knowingly accepted and acknowledged that his "regular rate" of pay would be reduced to $11.15 per hour and that his schedule would be increased to include *not fewer than sixty (60) hours of scheduled work per workweek*. This "regular rate" was a bona fide rate reduction in consideration of the three recognized factors relevant to the consideration. Moreover, because the rate was tied to a *minimum number of additional weekly hours* to be scheduled, the new assignment amounts to a guaranteed wage pay agreement which the U.S. Supreme Court has already recognized as compliant with the FLSA. As such, and because the "regular rate" actually paid to Thompson was neither "wholly unrealistic" nor "artificial", and because he was actually paid at the corresponding overtime rate for at least the negotiated minimum number of twenty additional weekly hours, the district court erred in denying Regions' motion for summary judgment, and erred in granting Thompson's motion for summary judgment on liability under the FLSA.

A.    **The Negotiated and Acknowledged Reduced "Regular Rate" of $11.15 per Hour is a "Bona Fide Rate Reduction" in Consideration of the Three Relevant Factors Identified in** *Parth v. Pomona Valley Hosp. Med. Ctr.***, 630 F.3d 794 (9th Cir. 2010)**.

 As previously noted, in the *Thompson Appeal I* this Court reversed entry of Final Judgment on the Pleadings in favor of Regions in order to permit Thompson an opportunity to develop a record in support of the idea that the manner in which Regions calculated the reduced "regular rate" of $11.15 per hour was "wholly unrealistic and artificial manner so as to negate the statutory purposes" of the Act. *Thompson v. Regions Security Services, Inc.*, 67 F.4th at 1306-07 (11th Cir. 2023). In *Thompson Appeal I*, this Court considered only the pleadings, before any evidentiary record was developed. Accordingly, *Thompson Appeal I* did not establish a standard or a list of factors to be considered in determining whether a reduced hourly rate of pay is bona fide under the FLSA. However, the Court *did* twice cite to the only circuit court of appeals to address this question and apply any standard to a fully developed evidentiary record: *Parth v. Pomona Valley Hosp. Med. Ctr.,* 630 F.3d 794 (9th Cir. 2010). *See Thompson v. Regions Security Services, Inc.*, 67 F. 4th at 1307. Thus, a review of the factors considered by the Ninth Circuit in *Parth* is the most logical and advisable starting point.

 In *Parth*, the Ninth Circuit Court of Appeals followed both the Supreme Court's decision in *Walling v. A. H. Belo Corp.*, 316 U.S. 624 (1942) and this Court's

decision in *Wethington v. City of Montgomery*, 935 F.2d 222 (11th Cir. 1991) to conclude that a hospital employer could lawfully reduce the pay rate of its employee nurses in order *to pay them the **same** wages* they received under the preceding schedule, so long as the rate reduction was not designed to circumvent the overtime provisions of the FLSA. *Parth v. Pomona,* 630 F.3d at 797.[9] In doing so, the Ninth Circuit affirmed the lower court's summary judgment in favor of the employer hospital upon concluding that the nurse employees had failed to adduce evidence or law sufficient to support their claim that the reduction in the "regular rate" of hourly pay represented an artificial altering of the regular rate of pay. *Id*. at 798.

Prior to finally making this determination, the Ninth Circuit requested that the U.S. Department of Labor ("DOL") submit an amicus brief in light of the fact that the case presented an issue of first impression. The DOL's amicus submission identified and considered **three factors** relevant to the inquiry and concluded that the reduction in the nurses' regular rate did <u>not</u> circumvent the FLSA's overtime requirements. *Id*. at p. 797. Thus, the only circuit court of appeals to determine

---

[9] /     Although both *A. H. Belo Corp.* and *Wethington* dealt with employers attempting to create cost-neutral pay plans that lowered employees' base hourly rates to conform to the anticipated applicability of FLSA requirements, the *Parth* Court expressly considered this authority in considering how to proceed in situations like the one it confronted dealing with facts and decisions made by the parties during periods when FLSA coverage already existed. *Parth v. Pomona,* 630 F.3d at 800-801.

whether a rate deduction is bona fide under the FLSA determined that the existence of three specific factors first identified by the DOL ensure the bona fides of a rate reduction. Specifically, the Ninth Circuit concluded in *Parth* that a reduction in regular rate of pay was entirely permissible when it was undisputed that the reduction was "(1) agreed to by the employee; (2) in place for a substantial period of time; and (3) equal to or in excess of the Act's minimum wage." *Parth*, 630 F.3d at 803.

Each of the *Parth* factors are undisputedly apparent in the *record* now before the Court, just as the original *pleading* had clearly suggested they would. Firstly, having never alleged that he was unaware of his new pay rate before working the new schedule, the record is now clear that Thompson agreed to, and even acknowledged the new rate *in writing*, before he ever worked the first hour of the new schedule. Secondly, Thompson's pleading and the evidence are now uniform in their recognition that the rate reduction was in place for almost an entire year and for the entire length of the period of alleged FLSA violation. Lastly, the negotiated rate of $11.15 per hour undisputedly exceeded both the federal and state minimum wage rates applicable during the period of the alleged violations.

There is no question of fact regarding any of the *Parth* factors; the evidence undisputedly makes clear that the rate reduction was not only bona fide under the FLSA, but was actually objectively beneficial to the employee and in keeping with the underlying statutory principal that the employer and employee ***must*** be "'free to

establish [the] regular [non-overtime] rate at any point and in any manner they see

fit,' '[a]s long as the minimum hourly rates established by Section 6 [of the FLSA]

are respected.'"). *Parth*, 630 F.3d at 799 (quoting *Walling v. Youngerman-Reynolds*

*Hardwood Co., Inc.*, 325 U.S. 419, 424 (1945).

> **B.** **Thompson Accepted a New Schedule that Would Include *not Less than a Minimum Sixty Hour Workweek* at the Straight-time Rate of $11.15 per Hour. The U.S. Supreme Court has (Since 1942) Deemed Such a Guaranteed Wage Agreement to be Compliant with the FLSA: *Walling v. A. H. Belo Corp.*, 316 U.S. 624, 631-32, 634 (1942)**.

Prior to performing any work during the Period of the Alleged FLSA

violations, Thompson acknowledged and accepted an offer to work at the regular

straight-time rate of $11.15 per hour. [ECF No. 32, ¶¶14-16, 19-20; 52-53]. In fact,

he acknowledged the new hourly rate in writing at the very beginning of January

2019 [ECF No. 31-2], when the client (BB University Office Building ("BB

University")) -- at whose location he had been assigned for several years -- reduced

the number of security service hours it would order. [ECF No. 32, ¶¶47-48]. It is

now clear not only from Plaintiff's pleading [ECF No. 1, ¶7, p. 2], but also from his

interrogatory answers [ECF No. 31-12, Item 2, p.2], and his deposition testimony

[ECF No. 28-1, p. 74: 13-24 and p. 75: 6-18] that Thompson *agreed* to the pay rate,

*before* he worked any hours at that rate, that he always knew *how much* he would be

paid for straight-time hours scheduled, and that this rate was accepted in conjunction

with a new schedule that would assign him *not less than* sixty (60) hours per workweek.

Specifically, where, prior to 2019, Thompson was regularly scheduled to work three days per week (an eight-hour shift Tuesdays, and double shifts on Thursdays and Friday) for a total of forty (40) scheduled hours per week, his new schedule would include additional assigned shifts at "BB University" on Mondays and Wednesdays, so that his weekly assigned schedule would be *at least 60 hours per week*. [ECF No. 32, ¶ 46]. Thus, the negotiated and accepted pay rate was accepted with a new schedule assigning him a *minimum sixty hours* per week, which tautologically yields a minimum guaranteed weekly wage of not less than $780.60 (i.e.: (40hrs. x $11.15) plus (20 OT hrs. x $16.73)) and $1,561.20 per bi-weekly pay period. This represented a substantial increase in earnings for Thompson's from his prior typical effective weekly wage of $520 (40 x $13.00). Thompson successfully negotiated this increase in his pay, notwithstanding the fact that BB University was reducing the number of security service hours it was ordering with the commencement of calendar year 2019. [ECF No. 32, ¶ 45].

It is undisputed that throughout the period beginning calendar year 2019 and continuing throughout the end of the period of the alleged FLSA overtime violations, Thompson was *scheduled* to work not fewer than sixty hours per week, and he was *paid* for not fewer than sixty hours per week. [ECF No. 32, ¶35]. During that period,

he was paid the negotiated $11.15 per hour for the first 40 hours of the schedule, and was paid the corresponding overtime rate ($16.73) for every scheduled hour in excess of forty (40) in the workweek. On occasion during that period, he was assigned *more* than 60 hours (never less), and was paid those additional hours at the same premium rate ($16.73), factored as a function (150%) of his acknowledged "regular rate" of $11.15, as negotiated. [ECF No. 31-3, pp. 12 and 14]. He was never scheduled or paid for less than 60 hours per week during the entire period of the alleged violation. This is different from pay schemes where the applicable rate is established at the *end* of the week, depending on the number of hours *worked*.

As early as 1942, the U.S. Supreme Court recognized that such a guaranteed weekly wage payment plan tied to an above minimum wage "regular rate" of hourly pay, clearly satisfied the requirements of the FLSA's overtime requirements. *Walling v. A. H. Belo Corp.*, 316 U.S. 624, 631-32, 634 (1942). Almost identically to Thompson's position in this case, the Administrator of the DOL's Wage and Hour Division argued that because the wage agreement called for a "guaranteed" weekly wage, that the "regular rate" for the workweek should be calculated by treating that guaranteed wage amount as the actual compensation paid during the week, dividing that amount by the number of hours worked, and declaring that to be the "regular rate" of pay rather than what the agreement actually paid for straight-time hours. The Supreme Court unambiguously rejected this position, stating:

37

[T]he guaranty contract in this case carries out the intention of the Congress. It specifies a basic hourly rate of pay and not less than time and a half that rate for every hour of overtime work beyond the maximum hours fixed by the Act.

*Walling v. A. H. Belo Corp.*, 316 U.S. at 634 (1942).  In so holding, the Supreme Court recognized that as a matter of law, the employer and employee could by agreement establish the "regular rate" so long as the statutory minimum wage was respected, overtime hours were paid at the premium rate (*Id*. at pp. 631 and 634), and that the guaranteed weekly wage was an acceptable means of securing uniformity (*Id*. at 632) in weekly income. The play plan was not a flat weekly wage since it actually paid all overtime hours at the statutory premium rate. This Court followed *Belo* in the context of a municipal employer's proposed pay rate changes shortly after the FLSA was amended to include municipal employers under its coverage. *See Wethington v. City of Montgomery*, 935 F.2d 222 (11ᵗʰ Cir. 1991). Citing *Belo*, this Court held that, "it is not a violation of the [FLSA] to reduce, prior to the effective date of the [FLSA], the hourly rate paid employees in order to avoid greater payments upon application of the FLSA". *Id.* at 229. See also *Bay Ridge Operating Co. v. Aaron,* 334 U.S. 446, 462 (1948) (citing *A. H. Belo Corp.* to illustrate "a guaranteed weekly wage contract that met the statutory requirements" of the Act).

Thompson negotiated a new rate and schedule that increased his take home pay and guaranteed a uniform minimum weekly wage beginning in 2019. He

undisputedly received at least that minimum weekly wage for the entire period of the alleged FLSA violation lasting at least 50 full weeks of consecutive work.

### C.    The Negotiated and Acknowledged Reduced "Regular Rate" of $11.15 per Hour is Not "Wholly Unrealistic".

Supreme Court authority makes clear that the FLSA "...clearly contemplates the setting of the regular rate in a bona fide manner through wage negotiations between employer and employee, provided that the statutory minimum is respected." *Walling v. Helmerich & Payne*, 323 U.S. 37, 42 (1944). So ". . .long as the minimum hourly rates established by Section 6 are respected, the employer and employee are free to establish [the] regular rate at any point and in any manner they see fit." *Youngerman-Reynolds*, 325 U.S. at 424. The sole limitation on "this freedom of contract" is that it "does not include the right to *compute* the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purposes" of the FLSA. *Helmerich & Payne*, 323 U.S. at 42 (emphasis added). See also *Thompson v. Regions Security Services, Inc.*, 67 F. 4th 1301, 1306 (quoting *Helmerich & Payne* and *Youngerman-Reynolds*.)

The negotiated and acknowledged "regular rate" of $11.15 per hour cannot be said to be "wholly unrealistic" since it represents what he was actually paid for straight-time hours for the entire period of the alleged violations. Further, the rate he was actually paid was more than what Thompson was already earning at a second part-time job with another security agency. At the time Thompson agreed to work

for a "regular rate" of $11.15 per straight-time hour with Regions, he was already working approximately twenty-four hours per week at a second security services job for a different, unrelated security agency which paid him less than $11.15 per hour. [ECF No. 32, ¶40, 49, 51]. In his interrogatory responses and deposition testimony, Thompson avers that he worked for the second employer at the rate of $11.00 per hour throughout his employment with Regions. [Thompson Depo., ECF No. 28-1, p. 96: 4-19 and p. 136: 2-7; Thompson Interrog., ECF No. 31-12, p. 5, item 8]. The new schedule with Regions and the corresponding regular rate of $11.15 per hour represented a higher pay rate, than that for which he was already working on Mondays, Wednesdays, and Saturdays for an unrelated security agency. [ECF No. 32, ¶40, 49, 51]. In other words, according to Thompson's own testimony and discovery responses, prior to accepting the new schedule and rate change with Regions, he was already scheduled to work sixty-four (64) hours per week, but he was not qualifying for or receiving overtime premium pay for any of those weekly hours over forty because he was splitting them between two employers. Thus, by accepting the new schedule and rate with Regions, Thompsom successfully consolidated at least sixty (60) weekly scheduled hours of work under one proverbial roof, and for the first time qualified for the payment of the overtime premium rate for excess hours he was already working.

Regions maintains that a "regular rate" of pay which is greater than one for which Thompson was already working for a second employer can hardly be considered "wholly unrealistic" under these circumstances. On the contrary, the reduced rate necessarily results in an increase in his weekly earnings because it is undisputedly tied to a minimum number of additionally scheduled hours, and therefore represents an objectively beneficial development in Thompson's situation. By contrast, there is no record evidence to support the idea that Regions had any incentive to increase from 40 to 60 the number of hours assigned to Thompson, since the number of personnel hours Regions must provide to its client is fixed by contract. [ECF No. 32, ¶¶45-50].

### D.    Neither is the Negotiated and Acknowledged "Regular Rate" of $11.15 per Hour "Artificial" Since It Represents the Only Compensation Actually Paid for Straight-time Hours Throughout the Alleged Period of FLSA Violations.

In order to properly calculate the overtime premium rate, an employer must first calculate the employee's "regular rate" upon which the 1.5 premium rate factor will be applied.  The FLSA specifically defines "regular rate" as follows:

> (e) **"Regular rate" defined**. As used in this section the "regular rate" at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee, ….

29 U.S.C. § 207(e). The Supreme Court has described "regular rate" as the hourly rate ***actually paid*** the employee for the normal, non-overtime workweek for which

41

he *is* employed—an "actual fact". *Walling v. Youngerman-Reynolds Hardwood Co.,* 325 U.S. 419, 424 (1945). The "regular rate" includes "all remuneration for employment paid to, or on behalf of, the employee" except payments "specifically excluded by paragraphs (1) through (7) of that subsection." 29 C.F.R.§ 778.108, referring to § 207 of the Act. 29 U.S.C. § 207(e)(1)-(8). An "actual fact," the regular rate is a mathematically calculable rate requiring knowledge of two variables: remuneration paid, and the number of straight-time hours worked. Thus, the "regular rate" of pay under the FLSA cannot be left to a declaration by the parties as to what remuneration counts in the calculation; it must be drawn from what happens under the employment contract. *Bay Ridge Operating Co. v. Aaron,* 334 U.S. 446 (1948). In other words, the "regular rate" cannot be artificially calculated in contravention of the actual mathematical reality.

The summary judgment rulings of the district court below are premised upon the idea that the rate agreed to by Thompson, and actually paid to him, is an "artificial regular rate". Notably, the FLSA does not define the phrase "artificial regular rate", but it is defined in Subpart F of the DOL Regulations governing "Pay Plans which circumvent the Act", which provides in pertinent part:

§ 778.500 Artificial regular rates.
**(a)** Since the term ***regular rate*** is defined to include all remuneration for employment (except statutory exclusions) whether derived from hourly rates, piece rates, production bonuses or other sources, the overtime provisions of the act cannot be avoided by setting an artificially low hourly rate upon which overtime pay is to be based and

making up the additional compensation due to employees by other means. ***The established hourly rate is the "regular rate" to an employee only if the hourly earnings are the sole source of his compensation***. Payment for overtime on the basis of an artificial "regular" rate will not result in compliance with the overtime provisions of the Act.

29 C.F.R. § 778.500 (emphasis added). In this case, the record remains clear and undisputed that the negotiated regular hourly rate of pay was the only remuneration paid to the Plaintiff for straight-time hours scheduled during "the Period of the Alleged FLSA Violations". It follows that if an employee is employed solely on the basis of a single hourly rate during any given workweek, the hourly rate is the "regular rate." This is especially so when the employee knowingly acknowledges and accepts the hourly rate of straight-time pay *before* he works *any* overtime hours.

## <u>CONCLUSION</u>

Employer Regions respectfully prays this Court will reverse the trial court's "Omnibus Order" [ECF No. 58] to the extent that it granted Employee Thompson's motion for summary judgment as to FLSA liability, and denied Regions' motion for summary judgment.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Pursuant to Fed. R. App. P. 32(g)(1), and 11th Cir.  R. 32-4, I hereby certify that the foregoing Defendant-Appellant Regions Security Services, Inc.'s Initial Brief complies with Fed. R. App. P. 32(a)(7)(B) in that it has been prepared using Microsoft Word in 14-point Times New Roman font and contains 10,939 words, excluding the parts of the document exempted by 11th Cir. R. 32-4.

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2024 a true and correct copy of the foregoing Defendant-Appellant Regions Security Services, Inc.'s Initial Brief was electronically filed with the Clerk of the Court via CM/ECF and served on the parties listed in the Service List below in the manner indicated therein.

Anthony F. Sanchez, P.A.
Attorneys for Defendant-Appellant Regions Security Services, Inc.
6701 Sunset Drive, Suite 101
Miami, Florida 33143
Tel.: 305-665-9211

By:   /s/ Anthony F. Sanchez
Anthony F. Sanchez
Florida Bar No.789925
afs@laborlawfla.com

44

## SERVICE LIST

Robert S. Norell, Esq.
Florida Bar No.: 996777
rob@floridawagelaw.com
assistant@floridawagelaw.com
***Counsel for Plaintiff-Appellee***
***David Thompson***
ROBERT S. NORELL, P.A.
300 N.W. 70th Avenue, Suite 305
Plantation, Florida 33317
Tel: 954-617-6017
Fax: 954-617-6018
*Via Notice of Electronic Filing*

Anthony F. Sanchez, Esq.
Florida Bar No.: 789925
afs@laborlawfla.com
faz@laborlawfla.com
***Counsel for Defendant-Appellant***
***Regions Security Services, Inc.***
ANTHONY F. SANCHEZ, P.A.
6701 Sunset Drive, Suite 101
Miami, Florida 33143
Tel: 305-665-9211